Good morning, your honors. John Burton for the plaintiff. David Tomlin. Very briefly, I think all the issues were pretty well covered in the papers. I'd like to reserve as much time as possible for rebuttal. But I think this is a case that really presents whether this court is going to enforce the rules that have been established for contacts between police officers who are investigating a crime. And citizens with whom they come in contact. The only question, it seems to me, is was there probable cause for his arrest, correct? Absolutely. And that test is the totality of the circumstances, correct? Absolutely. And you use an objective standard, not a subjective standard. Absolutely. And I understand that Ninth Circuit law, the test is whether the police know reasonably trustworthy information sufficient to warrant a prudent person in believing that the accused had committed or was committing an offense. That's from Del Vizo. Do you agree with that standard? Yes, it's stated in many permutations, but they all essentially mean that. Now, the police here had a maximum signal from their load jack. They had confirmation from a helicopter that the car they saw matched the stolen vehicle insofar as it was blue, it was a Jaguar, it had four doors, and it had chrome wheels, correct? All that's confirming information from the helicopter? Yes. I fail to understand how a helicopter could understand it had chrome wheels, but that's in the record. The police go to the parking lot, they see the Jaguar, they have the maximum signal. Turns out they were wrong. That's very unfortunate. But if you're using an objective standard, why isn't that most certainly probable cause for the police to arrest the man who's standing outside talking on his phone, and I believe had been seen by the helicopter to exit the Jaguar? Because that's not the totality of the circumstances. The totality of the circumstances, and the one that jumps out and is really, I think, the elephant in the room here, is the fact that many cars can look alike, especially depending on the level of generalization. This is a very general description, a color and a make. What makes cars unique... It's not a Ford Focus, it's a Jaguar, which I think, presumably there aren't that many blue Jaguars. I have a little trouble with the statement that it's unusual for it to be in a low income area, but go ahead. Well, there are obviously two different Jaguars here, but what makes a car unique is the fact that it has a clearly visible license plate. So when the officers came down, first, the fact that there was a low jack report doesn't actually mean a crime has been committed. It means a car has been reported stolen by someone, and the low jack activated. Now, that could happen because a car was actually stolen, or because a person misplaced a car, or loaned it and didn't get it back. Via that as it may, it was perfectly appropriate for the officers to investigate why was this low jack going off and why was this car here. They were not free to ignore the license plate. They knew the license plate of the stolen car. As soon as they saw the license plate of Mr. Tomlin's car, it was not a match. But that doesn't mean very much if you know anything about law enforcement. I mean, one of the first things that's done with respect to many stolen cars is to switch the plates and sometimes to get rid of the visible VIN. I mean, anybody who's been involved in law enforcement knows that. The license plate is not dispositive one way or the other. Well, I think since I've been doing these cases for 30 years, I do know a bit about law enforcement, and I understand cold plating, and that was heavily litigated and argued in this case. That's what the officers said they did. So what do you do to see whether there's a cold plate? You run the number of the plate and see if it comes back to that car. That's a process that takes a moment to do. It's done thousands of times by thousands of officers over the radio, which they had, or over the onboard computer, which they had. And when they did that, the plate immediately came back to that car, not to another car, but to that car, a blue Jaguar 2004 abandoned class registered to that man, David Tomlin, who had a license. They also looked in the car and saw that there was a registration, a written registration with that car, that VIN, that plate, that man. Now, did they do all this after they arrested your client? That would depend on when this detention became a, quote, arrest. Okay, let me ask you this in a different way, then, without the term arrest. Did they do all this after they had physically detained your client and placed him in the back seat of the car? Yes. Now, one of my problems with the way this case is being litigated is there appears to be no claim that the period of detention was excessive. The only claim appears to be that the initial arrest was incorrect. So they learn all this stuff. It takes them something like 35 minutes to say, hey, you're free to go now. But at the time of the arrest, they hadn't done it. I should say at the time of the physical detention. I'll put the word arrest to one side. Your Honor, this issue arose, I think, in sort of a backhanded way. I don't know if that's the right term. The issue on summary judgment was, was there an arrest or not? Detective, I'm sorry, Deputy Castaneda, the officer, said there was no arrest. We did not arrest him. His supervisor, Sergeant Pasquale, said this was not an arrest. They said it was an investigatory detention, a Terry stop. We agreed that the Fourth Amendment, under these facts, a low jack signal and a generally matching vehicle would justify a Terry stop. But a Terry stop, since by its very nature may subject an innocent person to a Fourth Amendment seizure, has limits that have been set by this court in cases like Washington v. Lambert. You can't swear at someone, put them on their knees, put guns at them, empty their pockets, handcuff them, and put them in a police car for half an hour. Did all of that happen here? All of that is undisputed. All of that is undisputed. It's undisputed. They came out. Mr. Tomlin had been talking on his cell phone outside of his car with the helicopter overhead for five minutes. And then the police came down, and he thought they were chasing someone else. And so when they came out and pointed guns at him and said, drop the fucking phone, he was flabbergasted. He complied. They ordered him to the back of the car. He had to get on his knees. He had to empty his pockets, or they emptied his pockets, handcuffed him behind his back in a way that was painful to this 57-year-old man. And a tenant is sticking her head out of the window saying, you guys are arresting the owner of our building. And then they walked him in the back of the police car where, according to their testimony, he spent more than half an hour. According to our version, he spent almost an hour. This went to a jury trial on the excessive force charge? Yes. And what happened? It was a defense verdict. And the jury was instructed, because of this order, that they had probable cause to arrest him. And your argument as to when the arrest took place, when, in your view, did the arrest take place? Well, certainly by the time they put him in the police car. In looking at this law, the time spent in the police car is relevant to when a detention becomes an arrest. But so also are all of these other factors, like the gun, handcuffing itself can transform a detention. So in your view, the arrest took place when? In our view, the arrest took place once he was directed at gunpoint to the rear of the car, made to kneel, had his pockets emptied, which was not a legal term. So that's the time for the arrest. And the issue in front of us is was there probable cause for the arrest? Yes. And I didn't complete my thought earlier. In the summary judgment motion, and when the case was litigated up to that point, it seemed to me to be assumed on both sides, certainly by the defendants themselves, that there was no arrest here, that they were lawfully doing a Terry stop. When we got to summary judgment, I would say 90 percent of the briefing, an argument was on whether or not these tactics were Terry tactics or arrest tactics. Certainly for me, Judge Wright, in his order, what was surprising in that he said, oh, well, this is obviously an arrest, which was our position. But then he said, but there's probable cause. And I think the reason that it's so easy to see this is not probable cause, I mean, if there's a probable cause to arrest someone for a crime, one has to think, well, that's, you know, really enough to take the person to jail and to file charges against them. And one could never do that in a case where someone simply had a car that was the same make and color and a load rack was going off. Here's where I'm headed. I want to know when you say the arrest took place. And in your view and under your argument, the arrest took place basically at the beginning of this episode. That is to say, when they take him around to the back of what turns out to be his very own car, they do these things to him that turned out to have been wrong. But that's the time of the arrest. And I gather that it is only after that takes place that they learn the additional information. No, I think that, yes, because the car was right there. The license plate was right there. He's standing next to his car. No, I got that. They knew that. I understand that. And they knew what the, so when they came down, they see a 57-year-old businessman who was not fleeing, was in fact doing the opposite. No, no, you're not taking my point yet. You tell me about, they run the plates. They discover that it really belongs to this car and so on. But that happens after they have put him in the car. Is that correct? They run the plate after, but the plate is there before. I understand that too. But at the time they make the arrest, it's still possible, maybe even likely, that if this is a stolen car, that these are false plates or the wrong plates. Correct? No, I just don't agree with that. The car had been reported stolen that day. Yes. It had just been driven into this particular location. It's standing there. They come back. They need to find out, is this our stolen car or not? The first thing they see is a non-matching plate. Now, maybe on further investigation, that will turn out to be the stolen car. Maybe it won't. That's why this is reasonable suspicion and terry-stop territory and not probable cause and arrest. Right away, there is a major, major discrepancy. The person doesn't look like a car thief. They're not in the process of dismantling the car. It's a very generic description. He had five minutes to flee when he was just standing there talking on his cell phone while a police helicopter was overhead. This is exactly why police, when they do this difficult work of law enforcement, have to consider, well, maybe this is our perpetrator and maybe it's not. And this court has said, under those circumstances, you need to treat these people with a certain amount of respect. Washington v. Lambert is right on point. Having some reason to believe that somebody may have been involved in a crime is not a license to point a gun at that person, to tell him to drop his fucking phone, to put that person on his knees, to handcuff him tightly, and to put him in a police car for half an hour. Okay. You've got about a minute and a half. Let's hear from the other side, and then we'll give you a chance to respond. Thank you, Your Honor. Good morning, Your Honor. May it please the Court, Karen Joynt on behalf of Deputy Defendants Castaneda and Liu. Your Honor, we believe that the district court's order, both that probable cause existed and in the alternative that qualified immunity would apply, both of those orders should be upheld and affirmed. However, I would like to draw the Court's attention to what I think is perhaps a misapprehension. At trial, one of the issues that was put to the jury was whether or not probable cause existed beyond the arrest point that both Mr. Burton and His Honor have identified, the moment where Mr. Tomlin was held at gunpoint and the officers took him into custody and handcuffed him. From that moment thereafter, the jury was asked to consider whether probable cause deteriorated. I see. So the jury, that question has already been before the jury. Yes, Your Honor. And I would draw the Court's attention to the supplemental excerpts of record, page 164, which is the jury instruction pertaining to that, that tells them you are being asked, however, to decide whether the defendant, Deputy Castaneda, detained the plaintiff after he knew or should have known that there was no probable cause to detain or arrest him. Was there a special verdict on that issue? There – I looked for this, Your Honor, and it's the trial record. It's docket 114, I believe, but it's under seal. So I'm going off my memory. My memory is that, yes, there was argument particular to that issue was did the probable cause remain or were the rights violated while Mr. Tomlin remained sort of in custody. We argued that it was a 35-minute period. The plaintiff argued a longer period. The jury had to make a factual determination and then decide whether the rights were violated. The verdict was that the rights were not violated. They also – So are you saying implicit in that is a conclusion by the jury that the probable cause had not deteriorated? Correct. Yes. They were also asked separately whether the use of guns at that moment when they were spoken, that was a factual dispute, whether that was excessive force. That was a separate inquiry, and they came back with a no constitutional violation in that regard either. But I think you're not arguing that we're bound somehow by the jury determination of probable cause not having deteriorated. That does not necessarily decide for us the question as to whether there was probable cause at the time of the arrest. I agree with what the court is saying. However, we do believe that the district court properly held that there was probable cause at that moment when they pulled into the driveway. Based on the low jack hit originally, the matching vehicle, as properly described by Judge Stein, and the maximum levels of intensity when they pulled into the driveway, the record also supports that in that the transcript of the radio reflects that when Deputy Castaneda is taking or finally getting access to Mr. Tomlin's vehicle, he says over the radio, and the transcript is part of the court's record, my low jack is kind of going crazy. And he's starting to realize that there's some conflict in the evidence that he needs to address. And I think that much, if any, of your argument is dependent upon a notion that blue Jaguars are relatively unusual. Again, I'll say, as Judge Stein said, not in this neighborhood, but just relatively unusual, and that this is not a report, for example, of a gray Honda Accord. We definitely believe that there's a distinction between a Honda Accord and a blue Jaguar, absolutely. Whether or not you take into consideration the nature of that neighborhood, it is a rare car, absolutely. And is there anything in the record to tell us the relative rarity of blue Jaguars? No, absolutely not, Your Honor, except that. So we're just supposed to know that? Well, I think that it is common knowledge, Your Honor. I think that that is reasonable common knowledge. However, what is in the record was that the deputies were unfamiliar with the model types, and that it was unusual for them to see this type of vehicle in their jurisdiction, basically. Whether or not that's characterized as lower income or not, it was their belief it was, but that was their characterization. But regardless, that was a ñ there is ñ in their declarations, that was an unusual vehicle to them, definitely. Okay. So the ñ just to address some of Mr. Burton's arguments, he indicated that the low jack is not an indicator of crime, because perhaps somebody could have borrowed the car without permission. We dispute that. Even if, in fact, there was some sort of borrowing without permission, that is, in fact, a crime. That's a violation of Vehicle Code 10851, which is driving a car without the owner's permission. I think it's quite reasonable for an officer to believe that if a low jack signal, based on a report of a car reported stolen that very same day, which is within the record that they did have knowledge that that car had been reported stolen that day, it's quite reasonable for them to have believed that the low jack was communicating to them that either a ground theft occurred or a Vehicle Code 10851 violation occurred. Mr. Burton makes a lot of comments about the license plate. All of those things were after acquired evidence. So as the Court asked, Deputy Castaneda did not see the license plate until after Mr. Tomlin was arrested and placed into the car. Didn't see it at all? Didn't see it at all. Now, that's odd, because you'd think that one of the things he might do before making the arrest is look. It wasn't as though it was covered, was it? Well, there's two issues. One is, if you remember from the record, there is a car exiting this very narrow. It's a single-lane driveway. There are photographs of it in the record. There is a car exiting that driveway. So when the officers pull in, they're obstructed by that car. So what's also reflected in the record is the transcript of what's happening, and they're actually pretty much narrating contemporaneously what's going on. And they talk about, we have someone at gunpoint. There's a car here that we need to clear. They ask the helicopter to clear, meaning to safety clear this back-enclosed lot. Again, there's a photograph of that as well. And you can see that there's a little wall there. So even though the picture does not reflect a car exiting, like on this February 2009 date, the car was parked. There's also an aerial shot in the record. The car was parked in a way that the deputy could not see the vehicle. Now, his attention for that. You mean couldn't see the license plate? Correct. I'm not certain he could see the vehicle much either, but certainly couldn't see the license plate. His attention at that. He better have seen the vehicle because that's his excuse for the, that's his justification for the arrest. He's aware that the vehicle is there. How much of the vehicle he can see, I'm not sure at that moment. Where was the defendant at that time? Standing in front of, I believe in front of the car. I can't remember if he's in front or behind of the car that's leaving or to the side of. But he's right near the car that's exiting. Did you say the defendant or the plaintiff, Your Honor? Excuse me. I meant the plaintiff. Okay. That's how I understood your question as well. There might have been defendant. So his attention at that moment, Deputy Castaneda's, was he had to obviously deal with the safety issues at hand. And then as soon as the helicopter says that back lot is cleared, he walks over. And the first thing he notices is that license plate is incorrect. And then that's the point at which potentially probable cause could have deteriorated. But the jury found consistently with our version and found that probable cause didn't deteriorate until the other car was located. So the narrative is the first time he actually sees the plate itself, let alone run the plates, is after the arrest has taken place. Yes. Yes. We agree, I think, with Mr. Burton on that issue. The registration in the car is also after required evidence. The VIN number also after required evidence. And we believe that Mr. Tomlin's conduct when the officers rolled up is not pertinent to this analysis. He was, except in the fact that he hesitated a moment in complying with the officers' orders. Mr. Tomlin, I think, quite genuinely states that that was out of shock. We know that now. But in the moment, the deputies just knew that he was not initially compliant. But beyond that, I think his behavior is not particularly relevant to the analysis. And except for just reminding the Court that even if the Court does not find that probable cause existed here, that we believe that based on the law and the facts, quality, qualified immunity certainly applies to both defendants. And I'll submit on that unless anyone has a question. Give me again your point about shock, because there's statement in the record that he initially resisted arrest. What are you saying about that? Oh, Mr. Tomlin? Yes. Well, Mr. Burton was making the point that Mr. Tomlin's conduct when they rolled into the driveway was innocent, so to speak. He wasn't tearing down the car. I think it was one of the examples he gave. He – it is in before the record that the deputies believed he was momentarily noncompliant. Yes. Resisting arrest. That was their impression. I think we all know now, and we certainly don't dispute, that now we know that Mr. Tomlin was genuinely surprised at what was happening. But in the moment, the officer's perception was is that he was resistive. All right. Okay. Thank you. Thank you, Your Honors. Thank you. You've saved some time. Thank you, Your Honors. Very quickly, he wasn't – no one said he was resisting arrest. That's a magnification of what they said. There was a momentary delay, according to them, that is explainable simply by the shock of the situation. It doesn't sound like your adversary is contesting that. The castanet de loup vehicle rolled all the way down the driveway, was back there. It was right next to Mr. – Mr. Tomlin was standing right next to his Jaguar. The plate was in full view. It wasn't covered up. It wasn't concealed. The testimony was simply that the deputy didn't – claims to have not bothered to look at the license plate to see whether it was the license plate of the car they were looking for or not before they did all these things to Mr. Tomlin. Whereas one might question the credibility of that testimony, if it's true, I don't think it's correct under an objective test that it would be reasonable for an officer who is going to put somebody through this kind of experience because he's suspected to be in the possession of a stolen car to not take a moment to look at the license plate and knowing what the license plate of the car they're looking for is, seeing that there's a discrepancy and having that give him pause such that he would follow this court's rules for a Terry stop, which fully protects the officers and the subjects and allows for them to conduct their investigation and to find out that in fact this person is never going to be a defendant because he's in violation of no laws whatsoever with allowing this person to maintain a certain amount of dignity. Handcuffing was probably unnecessary entirely. Certainly gunpointing was not – Yeah, but that I guess you've already gone to the jury on. But, Your Honor, on the jury, the jury was instructed they had probable cause to arrest him for auto theft and then they had a police practices expert say when somebody is being arrested for auto theft, it's a felony and for felony arrest you do these things. And then also the whole dissipation of the probable cause is an assumption that there was probable cause in the first place, which they were told because of this ruling.  We're concerned with this ruling. So thank you very much for your patience. Thank both sides for your arguments. The case of Tomlin v. County of Los Angeles now submitted for decision. Anybody need a break? Want a break? No, I'm just asking you if you want one. Need a break? Okay. The last case on the calendar this morning, United States v. Vogel.
judges: Stein, Trott, Fletcher